IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TSUNGAI TUNGWARARA,<br><br>             Plaintiff,<br><br>    v.<br><br>United States of America,<br><br>             Defendant. | No. C-04-02144 EDL<br><br>**ORDER GRANTING DEFENDANT ALFERT LUDWIGS' MOTION FOR SUMMARY JUDGMENT** |

**I. INTRODUCTION**

Plaintiff Tsungai Tungwarara, an eighteen year old Zimbabwean citizen coming to the United States for the first time, arrived at San Francisco International Airport ("SFO") on January 9, 2002 with a tourist visa. She stated that she planned to visit her mother and sister in the Bay Area. After her initial immigration inspection, she was selected for a secondary inspection, which was conducted by defendant Alfert Ludwigs, an Immigration and Naturalization Services ("INS") agent.[1] Tungwarara contends that during this secondary inspection, Ludwigs threatened and intimidated her, eventually coercing her into signing a false statement and withdrawing her application for entry into the United States. After being detained in an INS waiting room at SFO for more than ten hours, she was handcuffed and transferred to the Oakland City Jail, where she was strip-searched pursuant to jail policy, and placed in the general jail population overnight. She was forcibly removed to Zimbabwe the next day, via Paris. Defendants claim that they excluded Plaintiff because she planned to stay in the United States to study and therefore could not enter the country on a tourist visa. Plaintiff disputes this, and her mother testified that Ludwigs made racially offensive remarks to her about aliens from African countries.

---

[1] On March 1, 2003, after these events, the INS became part of the Department of Homeland Securities, and some of its functions were assumed by the newly created Immigrations and Customs Enforcement Bureau.

Based on these events, Tungwarara filed claims against the United States for intentional infliction of emotional distress, false arrest and imprisonment, negligence, assault, battery, violation of the California Constitution, and violation of California Civil Code section 52.1(b). She also sued the United States and Ludwigs for violating her Fourth and Fifth Amendments rights. Ludwigs then filed this motion for summary judgment on the Fourth and Fifth Amendment claims asserted against him, based on qualified immunity.

## II. ANALYSIS

### A. Qualified Immunity Standard.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether Ludwigs is entitled to qualified immunity, the Court must examine "(1) whether 'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right'; and, if a violation of a constitutional right is found, (2) 'whether the right was clearly established.'" Wong v. United States, 373 F.3d 952, 966 (9th Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law[.]'" Saucier, 533 U.S. at 202 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991). If Defendant had a reasonable but mistaken belief that his conduct was lawful, qualified immunity applies. Saucier, 533 U.S. at 205-6.

In determining whether a legal proposition is "clearly established," the Court first looks to the Supreme Court, the Ninth Circuit, and local district courts. Procunier v. Navarette, 434 U.S. 555, 565 (1978); Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir. 1995). In the absence of such binding precedent, the Ninth Circuit allows district courts to examine "whatever decisional law is available to ascertain whether the law is clearly established," including law from state courts, other circuits and other district courts. Capoeman, 754 F.2d at 1514; Drummond v. City of Anaheim, 343 F.3d 1052, 1060 (9th Cir. 2003) (quoting Malik v. Brown, 71 F.3d 724, 727 (9th Cir. 1995)).

**B. Plaintiff's Fourth Amendment Right Was Not Clearly Established In 2002.**

The Fourth Amendment proscribes "unreasonable searches and seizures." Allen v. City of Portland, 73 F.3d 232, 235 (9th Cir. 1995). The test of reasonableness requires courts to balance the governmental interest that justifies the intrusion and the level of intrusion into the privacy of the individual. Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1496 (9th Cir. 1996). Plaintiff argues that the strip search at the Oakland City Jail violated her Fourth Amendment rights because the severe level of intrusion into her privacy was not balanced by any governmental interest. Defendants deny that this "non-intrusive" search violated Plaintiff's rights. Even if the search did violate her rights, however, Ludwigs argues that he cannot be liable because (1) he did not personally conduct or order the strip search, or even make the decision to detain her at the Oakland City Jail; and (2) he is entitled to qualified immunity.

    1.    <u>Plaintiff has raised a triable issue of fact that Ludwigs set in motion events that foreseeably caused the strip search to occur.</u>

It is undisputed that Ludwigs knew that all aliens sent to the Oakland City Jail pending repatriation were routinely strip searched. It is also undisputed that the INS' policies strongly discourage holding non-admitted aliens in jail "absent extraordinary circumstances." See Declaration of Patrice Harper ("Harper Decl."), Ex. 11 at 2. Ludwigs argues, however, that he cannot be liable because his supervisor, Assistant Port Director Frederick Ho, made the decision to detain Tungwarara and caused her to be sent to the Oakland Jail. See Harper Decl., Ex. 5 at 154:17-155:10. It is undisputed that Ludwigs was not involved in the decision to detain Tungwarara and was not consulted about where to detain her. See Declaration of Andrew Cheng ("Cheng Decl."), Ex. F at 185:16-186:9; Reply Declaration of Andrew Cheng ("Cheng Reply Decl."), Ex. C at 22:4-23:25, 85:6-11. Nonetheless, Tungwarara asserts that Ludwigs' falsification of her sworn statement set events in motion that foreseeably led to Mr. Ho's decision to detain her in jail rather than parole her pending removal, and thus to the strip search.

On summary judgment, the Court cannot resolve disputed issues of fact, but only determine whether, viewing all the disputed facts in the light most favorable to Tungwarara, she has raised a disputed issue sufficient to withstand summary judgment. At her deposition, Tungwarara testified that the only purpose of her trip was to visit her mother. See Cheng Decl., Ex. E at 13:4-8, 22:5. During her secondary interview, she told Ludwigs that she had traveled to San Francisco to visit her mother. Id. at 21:3-14,

3

25:15-19. She denied ever telling him that the intended to study at City College in San Francisco. Id. at 25:20-26:1. Although at one point Tungwarara testified that she may have mentioned to Ludwigs that she intended to study journalism and broadcasting, she did not say that she intended to do so in the United States. Id. at 85:15-21. (She is currently studying at University of Fort Hare in South Africa. See Cheng Reply Decl., Ex. A at 206:20-22.) She admitted that it was possible that, during her secondary interview, she might have told Ludwigs that she was coming to San Francisco to go to college and get a degree, but she does not recall actually telling him this. Id., Ex. A at 184:3-21.

Plaintiff claims that Ludwigs refused to write down the answers she gave him during the secondary interview, raised his voice and "made implied verbal threats" when she insisted on telling him that the purpose of her trip was to visit her mother. Cheng Decl., Ex. E at 27:3-28:8, 33:9-34:15. Ludwigs does not even allude to this purpose in the sworn statement that he completed for her. See id., Ex. D. On the contrary, the sworn statement unequivocally contends that she had come to the United States to "go to college and get a degree." Id., Ex. D at 3. Tungwarara claims that she was not allowed to review the statement before certifying it, and only signed it because Ludwigs told her that she would be able to see her mother if she signed the document. Harper Decl., Ex. 5 at 55:8-16, 57:6-23.

Based on the contents of that sworn statement, Tungwarara was excluded from the United States because she held a visitor visa, not a student visa. Even if she was excludable, Tungwarara could have been paroled while awaiting her return flight to Zimbabwe. However, at least in part because of the alleged misinformation in the sworn statement, Assistant Port Director Frederick Ho determined that Tungwarara was a flight risk and should not be paroled into her mother's care while awaiting removal. Cheng Reply Decl., Ex. C at 86:15-87:23. Mr. Ho testified that he decided to detain Plaintiff because she had no return ticket, had no assets in Zimbabwe, carried only thirty dollars, had a mother who already lived in the United States, and admitted in her written statement that she was coming to the United States to study and live and work; she therefore appeared to Mr. Ho to be an "intending immigrant." Cheng Reply Decl., Ex. C at 86:15-87:23. While the written statement was only one factor in his decision, Defendant did not offer any testimony on whether Mr. Ho would have made the same decision to detain Plaintiff overnight without that statement. In the absence of such evidence, the Court cannot presume on summary judgment that Mr. Ho would have made the same decision. It is undisputed that Ludwigs knew that, if Mr. Ho decided to detain

4

Tungwarara overnight, she would be sent to the Oakland City Jail because SFO lacked proper detention facilities. Harper Decl., Ex. 5 at 177:11-178:25; Ex. 8 at 15:5-11. He also knew that, if this happened, Plaintiff would be strip searched. Id., Ex. 5 at 187:3-21; Ex. 8 at 32:22-33:7. This appears to be a sufficient causal link to at least raise a triable issue of fact for purposes of summary judgment, see Wong v. United States, 373 F.3d 952, 966 (9th Cir. 2004), although it may or may not suffice at trial.[2] The Court therefore must engage in the qualified immunity analysis.

2. The strip search was unconstitutional.

It is undisputed that the strip search here was not based on any suspicion, reasonable or otherwise, that Tungwarara was carrying hidden weapons or contraband, but rather on the policy of the Oakland City Jail to conduct routine strip searches of all detainees. In these circumstances, even "non-invasive" strip searches like the one to which Plaintiff was subjected would be plainly unconstitutional if she were a citizen or admitted alien. See Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir. 1984) (per curiam) (Fourth Amendment prohibits blanket policy of strip searching individuals charged with minor offenses absent reasonable suspicion that detainee is concealing contraband) (overruled on other grounds by Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc)); Fuller v. M.G. Jewelry, 950 F.2d 1437, 1445-50 (9th Cir. 1991) (to determine whether search policy is constitutional, courts must balance need for the search against personal rights affected).

The question is whether Plaintiff's status as a non-admitted alien changes the outcome of the Fourth Amendment analysis. Rights under the Fourth Amendment fall along a continuum, with United States citizens and resident aliens afforded the most protection, aliens living in the United States without permission but who have developed ties to the community somewhat less, and non-admitted aliens the least. Non-resident aliens who seek admission into the United States are subject to the "entry fiction: "'[A]lthough aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as

---

[2] Neither Wong nor the cases it cites addresses whether the initial actor must intend the unlawful consequences of the act that set in motion the constitutional violation, or whether these consequences must simply be foreseeable. Here, an INS officer at SFO in 2002 apparently had no choice but to house detained aliens at the Oakland City Jail. If foreseeability alone suffices, Ludwigs could be liable even if his decision to detain someone was based on an entirely proper motive (*e.g.*, a proper determination that an alien carried forged papers).

5

never having effected entry into this country.'" Alvarez-Garcia v. Ashcroft, 378 F.3d 1094, 1099 (9th Cir. 2004) (quoting Barrera-Echavarria v. Rison, 44 F.3d 1441, 1450 (9th Cir. 1995) (en banc) (superceded by statute on other grounds)); see also Wong, 373 F.3d at 970-71 ("The Supreme Court has long recognized a distinction between the constitutional rights afforded those who have effected an entry into the U.S., whether legally or otherwise, and those considered never to have entered. . . . Aliens inside the U.S., regardless of whether their presence here is temporary or unlawful, are entitled to certain constitutional protections unavailable to those outside our borders. . . . At the same time, under the "entry fiction" . . . an alien seeking admission has not "entered" the United States, even if the alien is in fact physically present"). "Noncitizens who are outside U.S. territories enjoy very limited protections under the Constitution." Barrera-Echavarria, 44 F.3d at 1448.

The Constitution does confer some fundamental rights to non-admitted aliens. For example, in Lynch v. Cannatella, 810 F.2d 1363, 1372-3 (5th Cir. 1987), the Fifth Circuit held that while excludable aliens have fewer rights than illegal aliens who have entered the United States and integrated to some degree into the population, and significantly less rights than legal residents and citizens, they still have the fundamental right to be free from inhumane detention, including beating and drugging by United States officials. The Ninth Circuit quoted Lynch with approval for its determination that the entry fiction "'does not limit the right of excludable aliens detained within United States territory to humane treatment.'" Wong, 373 F.3d at 972 (entry fiction pertains mostly to narrow question of scope of procedural rights available in admission process, and does not apply to certain other constitutional rights); see also Papa v. United States, 281 F.3d 1004, 1010 (9th Cir. 2002) (citing Lynch and explaining that "[l]imited rights under the Due Process Clause extend to detained aliens. Officials may not, for example, consciously disregard or act with deliberate indifference toward a detainee's safety by knowingly placing that person in harm's way"); Zadvydas v. Davis, 533 U.S. 678, 704 (2000) (Scalia, J., dissenting) (removable aliens cannot be tortured).

The Supreme Court has left open two distinct, but often related, questions regarding strip searches of non-admitted adult aliens at the border, the first relating to the search's location at the border, regardless of the immigration status of the person being searched, and the second to the impact, if any, of that person's immigration status:

6

> It is also important to note what we do *not* hold. Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches. Both parties would have us decide the issue of whether aliens possess lesser Fourth Amendment rights at the border; that question was not raised in either court below and we do not consider it today.

United States v. Montoya de Hernandez, 473 U.S. 531, 541 n.4 (1984). The Ninth Circuit has addressed the first question squarely, finding that "our precedents clearly hold that a strip search involves more than a routine invasion of the traveler's personal privacy and therefore requires at least an individualized 'real suspicion.'" United States v. Handy, 788 F.2d 1419, 1420 (9th Cir. 1986) (quoting United States v. Aman, 624 F.2d 911, 912 (9th Cir. 1980)); see also United States v. Tsai, 282 F.3d 690, 694 (9th Cir. 2002) (quoting Handy in case involving permanent resident alien, and agreeing that strip search requires individualized suspicion).

A number of cases strongly indicate that some level of objective reason for suspicion is also required to strip search non-admitted aliens at the border. For example, in Flores v. Meese, a district court held that INS officers could not strip search juvenile illegal aliens at the border absent a reasonable suspicion that the search would yield weapons or contraband. 681 F. Supp. 665 (C.D. Cal. 1988). Without this reasonable suspicion, strip searching a juvenile alien would be unconstitutional. Id. at 669. The Flores decision balanced a number of factors that weighed against the constitutionality of routine strip searches, only one of which was age. All the other factors applied equally to adults. In reviewing a number of cases, including cases from the Ninth Circuit, the Flores Court noted that:

> [i]n all of these cases, policies authorizing routine strip searches of adults charged with minor offenses were found to be constitutionally repugnant. Certainly, application of such policies to children, who have not been charged with any criminal offense, is even more so. Children confined by the INS are not charged with any criminal offense, let alone an offense that might indicate a propensity to conceal weapons or contraband on their persons.

681 F. Supp. at 668; see also United States v. Rodriguez, 592 F.2d 553, 556 (9th Cir. 1979) ("While anyone at a border may be stopped for questioning and subject to an inspection of luggage, handbags, pockets, wallets, without any suspicion at all on the part of customs officials, 'real suspicion' is required before a strip search may be conducted"); Kirkpatrick v. Los Angeles, 803 F.2d 485, 489 (9th Cir. 1986) (government interest in preventing entry of contraband into country justifies searches at border that would otherwise not be constitutional, but border officials nonetheless must have "real suspicion" that contraband

7

will be discovered before ordering strip search)[3]; United States v. Oyekan, 786 F.2d 832 (8th Cir. 1986) (reversing district court's implicit holding that two Nigerian citizens' "fourth amendment rights were in fact violated when they were detained and subjected to a strip search and x-ray on less than probable cause" because the customs officials had reasonable suspicion to strip search and x-ray the defendants"); United States v. Gonzalez-Rincon, 36 F.3d 859 (9th Cir. 1994) (in case involving non-resident alien adults, Ninth Circuit held that border officials needed reasonable suspicion that person smuggled drugs in order to strip search them). Although none of these cases explicitly addresses whether the same rule applies to strip searching non-admitted adult aliens at the border, Oyekan and Gonzales-Rincon involve non-resident aliens. Moreover, Defendants have cited no case that supports a different conclusion.

The purpose of border inspections is to determine whether an alien is admissible or carrying contraband or weapons. See United States v. Tsai, 282 F.3d 690, 699 (9th Cir. 2002) (Berzon, J., concurring) ("The authority to search at the border has always been justified as 'necessary to prevent smuggling and to prevent prohibited articles from entry,'. . . and to determine whether the individual presenting himself at the border is 'entitled to come in'") (internal citations omitted); Kirkpatrick, 803 F.2d at 489 ("The government has an interest in preventing the entry of contraband into the country which justifies some searches at the border that would not otherwise be constitutional") (citing Montoya, 473 U.S. 531 (1985)). Strip searches therefore should be tailored to serve these purposes.

As the Supreme Court observed in United States v. Flores-Montano, intrusive searches of the person implicate important dignity and privacy interests. These interests are fundamental to all human beings, not just admitted aliens and citizens. 541 U.S. 149, 152 (2004); see also Thompson v. City of Los Angeles, 885 F.2d 1439, 1446 (9th Cir. 1989). The Ninth Circuit has pointed out the need not to interpret the entry fiction so expansively that it "would allow any number of abuses to be deemed constitutionally permissible merely by labeling certain 'persons' as non-persons.'" Wong, 373 F.3d at 974. The court also observed that denying any rights to non-admitted aliens who properly present themselves for inspection at the border would provide a perverse incentive for aliens to enter the country secretly and live here

---

[3] The Ninth Circuit noted that the Supreme Court had suggested in Montoya that "real suspicion" was a third standard that was likely not grounded in the Fourth Amendment, thus calling into question prior Ninth Circuit cases, such as Handy and Rodriguez, using that terminology. Kirkpatrick, 803 F.2d at 489 n.3. Neither Kirkpatrick nor Montoya, however, questioned the holdings of those cases.

unlawfully, yet enjoy greater Constitutional protections. Id. at 973-74. These same considerations apply with equal force to bar the routine strip searches of non-admitted aliens at the border.

The Court therefore concludes that some level of suspicion is required under the Fourth Amendment to conduct strip searches of non-admitted aliens.[4] Indeed, this Court concludes that this right is now clearly established in light of the reasoning employed by the Ninth Circuit in Wong, which applies analogously to the right to be free from non-routine searches absent some level of suspicion.

3. This right was not clearly established in 2002.

The more difficult issue is whether Tungwarara's Fourth Amendment right to be free from a strip search absent suspicion that she was concealing weapons or contraband was clearly established in 2002. As the court in Wong recognized, prior to its decision in that case the law was unsettled regarding the extent to which non-admitted aliens enjoyed substantive constitutional rights. 373 F.3d at 976. As Barrera-Echavarria observed, "the law is not settled with regard to nonprocedural rights. Some of the cases involving excludable aliens suggest that they do enjoy certain substantive constitutional rights." 44 F.3d at 1449 (citations omitted). In fact, in Papa, the Ninth Circuit affirmed the district court's dismissal of claims of unreasonable search and seizure and discrimination by an alien seeking admission into United States on the ground that such aliens are not afforded due process protections. 282 F.3d at 1010. And the Supreme Court observed in United States v. Verdugo-Urquidez that the Fourth Amendment's use of the term "the People of the United States," rather than "persons," "[w]hile . . . by no means conclusive . . . suggests that 'the people' protected by the Fourth Amendment . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. 259, 265 (1990).

The strip search here was an unwarranted and painful affront to Plaintiff's privacy and dignity, and this Court has concluded that it was unconstitutional. At the same time, the pat-down search here did not constitute the kind of "gross physical abuse," "reckless indifference to safety," or "torture" that was more

---

[4] The Court does not decide today what level of suspicion is required, nor even whether that suspicion need be particular to the individual as opposed to, for example, a category of those traveling from a particular place identified as the source of numerous terrorist attacks. Cf. Wong, 373 F.3d at 974, n.29 (holding that equal protection component of Due Process applies to non-admitted aliens, but declining to address whether the usual heightened scrutiny standard applies to racial, national, or religious profiling of such aliens); Lynch, 810 F.2d at 1373 (government classifications based on alienage may be subject to either close scrutiny or rational basis analyses).

9

1 clearly forbidden by the case law as of 2002. Plaintiff testified that she underwent a pat-down search,
2 conducted by a female officer in private. The officer was not mean to her, did not raise her voice, and did
3 not touch her genitals. See Harper Decl., Ex. 1 at 168:21-169:9; Cheng Reply Decl., Ex. A at 147:20-
4 149:17; cf. Cheng Reply Decl., Ex. A at 154:3-154:25 (describing strip search at Paris airport, where
5 Plaintiff underwent a body cavity search). This is not a case where the official's actions were so egregious
6 that the Court can conclude that Tungwarara's right was clearly established absent clearly applicable
7 contemporaneous decisional law. Cf. Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004) (per curiam) ("in
8 an obvious case, these standards [of reasonableness under the Fourth Amendment] can 'clearly establish'
9 the answer, even without a body of relevant case law") (citing Hope, 536 U.S. at 738).

10 The case that most strongly supports Plaintiff's attempt to show that her right was clearly
11 established in 2002 is United States v. Gonzales-Rincon, 36 F.3d 859 (9th Cir. 1994). There, in a case
12 involving a non-resident adult alien, the court noted that strip searches "of course . . . must be supported by
13 reasonable suspicion." 36 F.3d at 864. However, the court there did not explicitly consider the issue of
14 the relative rights of an alien subject to the entry fiction left open in Montoya. One could argue that the right
15 was so obvious that the court did not need to do so. That argument falters, however, in the face of the
16 Ninth Circuit's decision en banc one year later in Barrera-Echavarria, characterizing the state of the law
17 with regard to nonprocedural rights of non-admitted aliens as "unsettled." See also Wong, 373 F.3d at 976
18 (citing same for proposition that Fifth Amendment protection for aliens was not clearly established).

19 The cases on which Tungwarara relies are distinguishable because none involves a non-admitted
20 adult alien at the border like Plaintiff where the court squarely addresses the implication of the alien's non-
21 admitted status. The defendant in United States v. Handy, 788 F.2d 1419 (9th Cir. 1986), was returning
22 from a trip to Thailand, and appears to have been either a U.S. citizen or resident. The defendant in United
23 States v. Aman, 624 F.2d 911, 912 (9th Cir. 1980), also appears to have been returning to the United
24 States from a trip to Thailand. While the nationality of the defendant in United States v. Rodriguez, 592
25 F.2d 553 (9th Cir. 1979), is never mentioned, the fact that he held an "alien reentry permit" suggests that he
26 was a lawful permanent resident returning to the United States, rather than a non-admitted alien seeking to
27 enter the United States for the first time. Although this Court has concluded that Flores, 681 F. Supp. 665,
28 which struck down a policy requiring the routine strip searching of all juvenile non-admitted aliens, supports

10

the unconstitutionality of the strip search here of Plaintiff, who was eighteen, the case could mistakenly but perhaps reasonably be distinguished because of the age difference. Id. at 667-68.

Accordingly, although this Court concludes that a non-invasive strip search of a non-admitted adult alien at the border without *any* suspicion of any kind is unconstitutional, the Court cannot conclude that this right was clearly established at the time of the incident. If the same search had occurred later after the Ninth Circuit's decision in Wong, or had been more invasive or abusive at the time, the Plaintiff's "clearly established" rights would likely have been violated. On the uncontested facts of the search here, however, Ludwigs is entitled to qualified immunity.

### C. Plaintiff's Fifth Amendment Right To Equal Protection Was Not Clearly Established In 2002.

Tungwarara argues that Ludwigs violated her Fifth Amendment right to be free from racial discrimination when he coercively interrogated her, separated her from her family, and sent her to the Oakland jail as punishment, all because of her race. Although the Fifth Amendment does not contain an explicit equal protection clause, the Supreme Court has held that discrimination may be so unjustifiable as to violate due process. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954); United States v. Rodriguez-Lara, No. 04-10113, 2005 U.S. App. Lexis 18427, at *6 n.2 (9th Cir. Aug. 26, 2005) (noting that while plaintiff brought an equal protection claim under the Fourteen Amendment, "a claim of discrimination by the federal government implicates the equivalent equal protection guarantee inherent in the Due Process Clause of the Fifth Amendment").

As evidence of Ludwigs' racial animus, Tungwarara offers the deposition of her mother, who testified that Ludwigs told her that Plaintiff should "go back to the jungle" and that "these people from Africa" were a "problem" and were not allowed into the country "after September 11th." Cheng Decl., Ex. A at 94:11-17; Ex. B at 59:23-60:14. For purposes of summary judgment, Tungwarara therefore has created a triable issue of fact as to whether Ludwigs violated her Fifth Amendment rights by discriminating against her on the basis of her race:

> The entry fiction does not preclude non-admitted aliens ... from coming within the ambit of the equal protection component of the Due Process Clause. We cannot countenance that the Constitution would permit immigration officials to engage in such behavior as rounding up all immigration parolees of a particular race solely because of a

11

> consideration such as skin color.... We can imagine no proper governmental interest furthered by the purely invidious discrimination alleged to have been carried out by individual INS officers in this case.

Wong, 373 F.3d at 974-75. Plaintiff therefore satisfies the first step of the qualified immunity analysis.

To establish that this constitutional right was clearly established in 2002, Plaintiff argues that INS handbooks at the time unequivocally instructed inspectors that immigration laws were intended to be non-discriminatory and should be administered "fairly and equitably." See Harper Decl., Exs. 12-13. However, in 2004 – two years *after* the incident – the Ninth Circuit stated that previously it had "never squarely held that [non-admitted aliens] are entitled to equal protection guarantees, nor [had] the Supreme Court." Wong, 373 F.3d 952. In fact, in 2002, the Ninth Circuit noted that an alien's Bivens claim that INS officials discriminated against him upon entry was correctly dismissed because "[a]liens are not afforded due process protections when they seek admission to the United States." See Papa, 281 F.3d at 1010 (but noting that detained aliens did have "[l]imited rights under the Due Process Clause" not to be treated with deliberate indifference or placed in harm's way by officials). INS field manuals are not "decisional law" for purposes of qualified immunity; Ninth Circuit cases like Wong and Papa are.

Moreover, Tungwarara's attempt to limit Wong based on that plaintiff's atypical immigration status fails because the plaintiff in Wong, if anything, would have been entitled to greater Fifth Amendment protections that the Plaintiff here. In Wong, the plaintiff entered the United States legally in 1985, resided here for fourteen years, and applied for permanent residence status before leaving the country in 1999. Upon reentry eighteen days later, she was found excludable because she had failed to secure advanced parole and thus was deemed to have abandoned her application for permanent residence. The court therefore noted that if there were any doubt as to whether non-admitted aliens were entitled to some level of equal protection, the balance was tipped in Wong's favor by her particular circumstances, including her allegation that her failure to get advance parole was due to illegal discrimination against her while she was still lawfully residing in the United States. See Wong, 373 F.3d at 976. In contrast, Plaintiff here was attempting to enter the country for the first time in 2002 on a tourist visa and had no prior ties to the United States. The constitutional right that Tungwarara seeks to vindicate therefore was not clearly established until the Ninth Circuit's decision in Wong in 2004. Accordingly, Ludwigs is also entitled to qualified immunity on Plaintiff's Fifth Amendment claim.

//
//
//
//
//
//

### III. CONCLUSION

For the reasons stated here, Ludwigs' motion for summary judgment on Tungwarara's Eighth claim for violation of the Fourth Amendment and Ninth claim for violation of the Fifth Amendment is GRANTED.

**IT IS SO ORDERED.**

Dated: October 13, 2005

ELIZABETH D. LAPORTE
United States Magistrate Judge